[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-14703
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 21, 2011
JOHN LEY
CLERK

D. C. Docket Nos. 1:04-cv-00606-RWS; 1:08-cv-02725-RWS

NEAL PARKER,
Individually and as Representative Plaintiffs on behalf
of all other similarly situated,
WILBERT CARLTON,
Individually and as Representative Plaintiffs on behalf
of all other similarly situated, et al.,

Plaintiffs-Appellants,

STEPHEN KING,
Individually and as Representative Plaintiffs on behalf
of all other similarly situated,

Plaintiffs,

versus

SCHMIEDE MACHINE AND TOOL CORPORATION,
THYSSENKRUPP MATERIALS NA, INC.,
d.b.a. Copper and Brass Sales,
ALCOA INC.,
MCCANN AEROSPACE MACHINING CORP.,

Defendants-Appellees.

_____

No. 10-14741

_____

D. C. Docket Nos. 1:08-cv-02725-RWS; 1:04-cv-00606-RWS

TIMOTHY P. BERUBE,
JOHN VANIMAN, et al.,

Plaintiffs-Appellants,

versus

SCHMIEDE MACHINE AND TOOL CORPORATION,
THYSSENKRUPP MATERIALS NA, INC.,
d.b.a. Copper and Brass Sales,
MCCANN AEROSPACE MACHINING CORP.,
ALCOA INC.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(October 21, 2011)

Before HULL and ANDERSON, Circuit Judges, and VINSON,* District Judge.

PER CURIAM:

_____

*Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

This case involves two separate actions consolidated for discovery purposes at the district court level and likewise consolidated on appeal.[1] The Plaintiffs appeal the district court's grant of summary judgment. Because we find that the learned intermediary or sophisticated user doctrine relieves the Defendants of liability, we affirm.

## I. BACKGROUND

The Plaintiffs are all current or former employees of the Lockheed Martin Corporation ("Lockheed") who have worked in its aircraft manufacturing plant in Marietta, Georgia. They have had a variety of different job responsibilities, time periods of employment, and work areas at the Lockheed facility, but they all have worked with and around beryllium-containing products. Since 1952, Lockheed's Marietta facility has produced aircraft that contain beryllium parts. At least nine different types of aircraft were produced at the site during the forty-year period in question in this suit. Lockheed identified more than sixty-five non-party suppliers of beryllium-containing products to the Marietta facility.

According to the Plaintiffs, any action that disturbs the surface layer of beryllium ceramic or metal can produce respirable particles. Sandblasting,

---

[1]     The Parker matter was commenced in early 2004. The Berube matter was commenced on August 27, 2008. The two matters were consolidated for discovery purposes by the district court on October 16, 2008.

polishing, drilling, and other types of high-velocity abrading are especially likely to generate respirable particles. In 1948, the Atomic Energy Commission established an exposure standard for beryllium of 2.0 µg/m³. This exposure standard was adopted by the Occupational Safety and Health Administration ("OSHA") and remains in place today. The Plaintiffs assert that even though this remains OSHA's standard, the beryllium manufacturing industry has long known that this standard is inadequate to keep workers safe from the effects of respirable beryllium.

The Plaintiffs claim that their handling of beryllium or their presence in areas where beryllium was being handled led to three of them contracting chronic beryllium disease ("CBD"), and nine of them getting beryllium sensitization, a precursor to CBD. The Plaintiffs sued Lockheed and various manufacturers of beryllium parts in Georgia state court alleging a number of claims, of which only the failure-to-warn claims remain.[2] The Defendants removed the action to the District Court for the Northern District of Georgia. Of the original defendants, Lockheed and several others were dismissed from both the Parker and Berube actions and Brush Wellman settled. Only four defendants—Alcoa, Inc., Schmiede

---

[2] The Plaintiffs in Parker were originally part of a much larger group of class-action plaintiffs. However, the district court dismissed the case, finding that the Plaintiffs' claims of subcellular, subclinical and cellular damage, and beryllium sensitization were not cognizable under Georgia law. This Court affirmed the district court's ruling as to subcellular, subclinical, and cellular damage but reversed as to beryllium sensitization. Parker v. Brush Wellman, 230 Fed. App'x. 878 (11th Cir. 2007).

Machine and Tools Corporation, Thyssenkrupp Materials North America, and

McCann Aerospace Machining Corporation—remain.

After a year-and-a-half of extensive discovery, the Defendants moved for

summary judgment. Although the district court originally denied the Defendants'

motions for summary judgment, the court later reversed itself[3] and, in September

2010, granted summary judgment on the basis of the sophisticated user doctrine

and the lack of direct causation. The Plaintiffs now appeal these rulings.[4]

---

[3] The district court, in its first summary judgment order on August 25, 2010, denied the Defendants' motions based on the sophisticated user or learned intermediary doctrine. However, the court subsequently reconsidered its order and held that Lockheed was a sophisticated user of beryllium. The Plaintiffs challenge the district court's power to reconsider its holding, claiming that the district court violated the notice requirements of Rule 56. The Plaintiffs rely on Imaging Business Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1191 (11th Cir. 2006), and Massey v. Congress Life Insurance Co., 116 F.3d 1414, 1417-18 (11th Cir. 1997). BancTec and Massey are easily distinguishable from the instant case because they involved the consideration of issues that the plaintiffs had not been given a chance to brief, not a reconsideration of previously briefed and decided issues. In the present case, "because the order [denying summary judgment] was interlocutory, 'the court at any time before final decree [could] modify or rescind it.' " Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 862 (5th Cir. 1970) (quoting John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 88, 42 S. Ct. 196, 198 (1922)); see also Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1315 (11th Cir. 2000) (noting that "the district court has plenary power over [interlocutory orders] and this power to reconsider, revise, alter or amend the interlocutory order is not subject to the limitations of Rule 59") (quotation and citation omitted). Thus, the Plaintiffs' argument is without merit.

[4] The court also granted the Defendants' motion to exclude the opinions of the Plaintiffs' expert, Dr. John Martyny, under the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (2003). However, the Plaintiffs did not challenge this decision in their initial appellate brief. They failed to state sufficiently that they were appealing the district court's exclusion of the expert testimony. They failed to include it in their statement of the issues, and they failed to clearly state it in a section or subsection heading. Furthermore, the Plaintiffs failed to state the standard of review for challenges to the exclusion of expert testimony, either in the standard of review section or in the argument. Issues that are not briefed on appeal are considered abandoned. Denney v. City of Albany, 247 F.3d 1172, 1182

5

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment <u>de novo</u>, drawing all reasonable inferences in the light most favorable to the non-moving party. <u>Moore ex rel. Moore v. Reese</u>, 637 F.3d 1220, 1231 (11th Cir. 2011). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.' " <u>Int'l Stamp Art, Inc. v. U.S. Postal Serv.</u>, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986)). "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' " <u>Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami</u>, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (modification in original) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986)).

---

(11th Cir. 2001). Accordingly, the Plaintiffs waived this issue on appeal, and the testimony and June 16, 2009, report from Dr. John Martyny are thus inadmissible.

6

## III. DISCUSSION

Under Georgia law, a product supplier has a duty to warn foreseeable users of a product's danger if (a) the supplier has reason to know that the product is likely to be dangerous for the use for which it is supplied, and (b) the supplier has no reason to believe that the user will realize the product's dangerous condition. Carter v. E.I. DuPont de Nemours & Co., Inc., 456 S.E.2d 661, 662 (Ga. Ct. App. 1995) (citing Restatement (Second) of Torts § 388). "The adequacy of the warning must be evaluated in conjunction with the knowledge and expertise of those who may be reasonably expected to use or otherwise come into contact with the product as it proceeds along its intended marketing chain." Thornton v. E.I. Du Pont de Nemours & Co., Inc., 22 F.3d 284, 289 (11th Cir. 1994) (affirming summary judgment where a professional-grade paint thinner, marketed through distributors for use by professionals, carried an adequate warning of its hazards).

However, the "sophisticated user" or "learned intermediary" doctrine relieves a product manufacturer or supplier of this duty to warn the ultimate user where there is an intermediary with knowledge of the hazard. See Dozier Crane & Mach., Inc. v. Gibson, 644 S.E.2d 333, 335-36 (Ga. Ct. App. 2007) ("Under the learned intermediary doctrine, a manufacturer is not normally required to directly warn the ultimate consumer of a known risk if there is a learned intermediary

7

between the manufacturer and the ultimate consumer."). "Where the product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession." Eyster v. Borg-Warner Corp., 206 S.E.2d 668, 670 (Ga. Ct. App. 1974) (quotation omitted) (affirming directed verdict for manufacturer where the hazard "was one commonly known to those in the trade").

The Defendants point to overwhelming evidence that Lockheed Martin was a sophisticated user of beryllium and a learned intermediary between the Defendants and the Plaintiffs. For almost sixty years, the Lockheed facility has produced aircraft containing beryllium parts. Since 1966, Lockheed has used the Department of Defense's "Handbook for Metallic Materials and Elements for Aerospace Vehicle Structures" as a standard reference guide regarding the use of beryllium. In 1983, Lockheed issued its own "Safety & Industrial Hygiene Standard No. 3.5." This document recognized that actions such as machining, polishing and grinding create beryllium dust and vapors that may ultimately lead to respiratory problems. Standard No. 3.5 outlined numerous engineering controls to be used to prevent the inhalation of beryllium particles. Lisa Bosserman, the manager of Lockheed's Environmental, Safety and Health department, testified that Lockheed has warned employees about the hazards of beryllium since at least the 1980s. She further

8

testified that a Material Safety Data Sheet ("MSDS") from a manufacturer is a generic warning and serves merely as a starting point for Lockheed's industrial hygienists and toxicologists, who conduct professional evaluations before issuing detailed warnings and safety procedures for employees using beryllium-containing raw materials. Dr. Pamela Rosett, a senior staff industrial toxicologist, testified that in 1993 she spent 300 to 400 hours researching the health effects of beryllium. Based on the record evidence, the Defendants have established that Lockheed is a sophisticated user of beryllium and a learned intermediary between its employees and the manufacturers of beryllium products.

In spite of Lockheed's expertise in the potential dangers of working with beryllium, the Plaintiffs contend that the Defendant-manufacturers possessed information regarding the risks associated with beryllium that Lockheed did not possess. The Plaintiffs, relying on Stuckey v. Northern Propane Gas Co., 874 F.2d 1563 (11th Cir. 1989), argue that Lockheed did not have actual knowledge of beryllium's dangers. In Stuckey, this Court, applying Georgia law, found that "a supplier's duty to warn a consumer does not turn on whether a warning was actually given to an intermediary, but on whether the intermediary's knowledge was sufficient to protect the ultimate consumer." 874 F.2d at 1568 (citing Eyster, 206 S.E.2d at 671). For purposes of this opinion we assume arguendo the

Plaintiffs' interpretation of <u>Stuckey</u> and the Georgia law. Under this assumption, if the Plaintiffs here adduce evidence from which the jury could conclude that (1) the Defendants possessed information, which Lockheed did not possess, regarding a particular danger associated with beryllium, and (2) the Defendants failed to warn Lockheed of that danger, then summary judgment based on the sophisticated user or learned intermediary doctrine would be inappropriate. However, the Plaintiffs fail to adduce any evidence to satisfy this standard.

As an initial matter, the Plaintiffs fail to point to admissible evidence demonstrating what knowledge the Defendants had regarding the hazards of beryllium. In a chart on pages 30-31 of their appellate brief, the Plaintiffs list eight statements allegedly demonstrating the "truth which defendants knew but failed to disclose." Of these eight statements, five cite only to Dr. Martyny's June 16, 2009, Amended Expert Report. As explained in note 4 <u>supra</u>, this report is not admissible evidence.[5] Therefore, the Plaintiffs have failed to point to record evidence to support these allegations. Similarly, two other statements in the chart point to Dr. Martyny's inadmissible report as well as paragraph 8 of the Plaintiffs' "Statements

---

[5]  Even if this evidence were admissible, it would not support the Plaintiffs' claim that the Defendants had superior knowledge. Dr. Martyny's report makes general references to the knowledge of the "beryllium industry," but cites specific evidence relating only to Brush Wellman, which is no longer a defendant in this case.

of Disputed Facts" ("SDF"), which paragraph fails to mention the Defendants at all. Finally, the remaining statement cites to Dr. Martyny's inadmissible report, Dr. Martyny's inadmissible testimony, Exhibit 54 (which contains two draft reports regarding audits of Lockheed's workplace controls), and Exhibit 55 (an internal Lockheed report regarding its steps to prevent beryllium exposure). Neither Exhibit provides any information regarding the Defendants. Accordingly, the Plaintiffs fail to adduce evidence demonstrating knowledge of beryllium hazards that the Defendants had but failed to disclose to Lockheed.

Even more significant, the Plaintiffs also fail to demonstrate that Lockheed lacked actual knowledge regarding the hazards of beryllium. In the chart on pages 30-31 of their appellate brief, the Plaintiffs list eight statements allegedly documenting "Lockheed's belief." However, none of the cited evidence supports these statements, and some of the cited evidence actually contradict the Plaintiffs' statements. For instance, the evidence the Plaintiffs cite for the proposition that Lockheed did not know that invisible particulate can cause disease fails to support this claim.[6] To the contrary, Dr. Rosett testified that Lockheed did not have a

---

[6]     Ms. Bosserman's cited testimony makes no mention of visible particulate. Instead, she testifies that she has read literature suggesting that some individuals may develop health effects from exposures below the OSHA standard. (Bosserman Dep. at 13-14). Similarly, the cited Exhibit 52 (a 1998 Manufacturing Process Standard that relates to drilling, reaming, and installation of expanded copper beryllium bushings) does not distinguish between visible and non-visible particulate. Instead, it warns that "Beryllium and alloys of beryllium (copper

belief that beryllium dust had to be visible in order to be present in potentially hazardous quantities. (Rosett Dep. at 459). In evidence cited by the Plaintiffs, Dr. Rosett further testified that Lockheed's scientists had knowledge that beryllium particulate was invisible even at the OSHA 2.0 µg/m³ standard. (Id. at 467, 460). Contrary to the sixth statement in the chart, Lockheed did not believe that exposures below 2.0 µg/m³ were safe.[7] In testimony not cited by the Plaintiffs, Dr. Rosett testified that in the early 1990s she did not know what a safe level of exposure to beryllium might be (Id. at 135), but that she found credible reports that individuals had developed disease at levels 10 to 50 times below the OSHA standard. (Id. at 151). Accordingly, she designed safety programs to achieve a level of exposure much lower than the OSHA standard. (Id. at 133). Thus, Lockheed had actual knowledge that invisible beryllium particulate in quantities below the OSHA standard can be hazardous.

The Plaintiffs also fail to support their second statement, which claims that Lockheed believed that local exhaust is required only when processes create visible

---

aluminum, etc.) are potentially very toxic. Any operation that produces airborne particles or fumes requires controls and approvals of the hazardous materials programs department." (Exhibit 52 at 6). The document further warns that "dust sized or smaller particles can be hazardous to your health." (Id. at 10).

[7]     The Plaintiffs' cited evidence reveals that Ms. Bosserman has read literature that suggests that some individuals may develop health effects from exposures below OSHA standards. (Bosserman Dep. at 14).

particulate. The evidence cited by the Plaintiffs makes no mention of visible

particulate.[8] The 1983 Hygiene Standard No. 3.5, which was not cited by the

Plaintiffs, recommended using local exhaust for operations which are capable of

producing airborne concentrations of dust, mists, or fumes in excess of the OSHA

standard. The Standard further explains that "[w]hen air exhaust is not available or

is inoperative, individual respiratory protection shall be worn where hazardous air

concentration is possible." Because Lockheed knew that particulate was invisible

even at the OSHA 2.0 µg/m³ standard, Lockheed had actual knowledge that local

exhaust may be needed even in the absence of visible particulate.

The Plaintiffs fail to adduce evidence to support the chart's remaining four

statements. The Plaintiffs' cited evidence does not support their claim that

Lockheed conducted air sampling only upon request of employees or upon

observation of visible particulate. (Bosserman Dep. at 81-84) (testifying that

---

[8] In the cited SDF paragraph, the Plaintiffs allege that "Lockheed did not require local exhaust when reaming, machining, deburring, or otherwise abrading beryllium-containing parts." The depositions the Plaintiffs cite fail to support this statement, revealing only that Ms. Bosserman did not know whether such exhaust had been utilized and that a 1998 Manufacturing Process Standard that relates to drilling, reaming, and installation of expanded copper beryllium bushings does not list local exhaust ventilatory control. Even if the Plaintiffs could prove that Lockheed did not employ the proper control devices, that proof would not be enough to rebut the evidence that Lockheed had actual knowledge of the need for such controls. Under the standard urged by the Plaintiffs, they must show that Lockheed lacked actual knowledge of beryllium's hazards, not that Lockheed failed to take all measures to adequately protect against those hazards. For this reason, the chart's third statement, "Reaming of copper-beryllium bushings was allowed to be performed without respiratory or ventilatory controls," also fails to demonstrate that Lockheed lacked actual knowledge about beryllium's hazards.

Lockheed has conducted periodic air testing since at least the early 1980s).

Testimony not cited by the Plaintiffs reveals that air sampling also was conducted when a process changed, when a new process was implemented, and when there was a change of material. (Id. at 241-42). Additionally, the Plaintiffs provide no support for the proposition that Lockheed believed that "[n]o protective measures are required when polishing or deburring"[9] or that "[d]edicated work clothing [is] not necessary."[10] Finally, the Plaintiffs provide no support for their contention that prior to 2002, Lockheed did not know that fatigue test aircraft would expose workers to respirable beryllium. The cited paragraph from the Plaintiffs' SDF makes no mention of fatigue tests, and Exhibit 53, an internal Lockheed document from June 2002, specifically acknowledges that "metal dust containing beryllium may be generated during fatigue cycling" and does not mention a lack of

---

[9] The cited deposition testimony merely states that Ms. Bosserman had never taken air samples during a deburring process. (Bosserman Dep. at 278-79). The 1983 Hygiene Standard No. 3.5, which is not cited by the Plaintiffs, provides that, "Operations involving beryllium which are capable of producing airborne concentrations of dust, mists, or fumes in excess of the [prescribed control limits] must be performed in a Beryllium Control Area where special engineering controls and air monitoring facilities are provided. Such operations include but are not limited to: machining, grinding, polishing, sanding, . . . ." (Emphasis added). The Standard goes on to list protective measures recommended and required for these activities.

[10] The cited deposition testimony merely states that a clothes-changing regimen was used in Lockheed's paint booths in accordance with an OSHA regulation. (Bosserman Dep. at 225-26). However, among the engineering controls recommended by the 1983 Hygiene Standard No. 3.5, which was not cited by the Plaintiffs, were "Company supplied work clothing, adjacent change room, and clothes laundering facilities." Thus, there is evidence that Lockheed had actual knowledge of the need for "dedicated work clothing."

knowledge before 2002.

For the foregoing reasons, the Plaintiffs have failed to make a showing sufficient to create a genuine issue of fact that the Defendants possessed information regarding a hazard of beryllium and that Lockheed lacked actual knowledge of that hazard. The Plaintiffs have failed with respect to both prongs; the Plaintiffs have failed to show either that Lockheed lacked knowledge of a particular hazard, or that these Defendants did have knowledge of that hazard. The overwhelming evidence in this record shows that Lockheed was a learned and sophisticated user of beryllium, and, if anything, possessed knowledge superior to that of these four Defendants.[11]

## IV. CONCLUSION

After a review of the briefs and the evidence cited by the parties, see Fed. R. Civ. P. 56(c)(1)(A), as well as the benefit of oral argument, we conclude that the Plaintiffs have not adduced any evidence that would rebut the Defendants' defense that Lockheed Martin was a learned intermediary and a sophisticated user of

---

[11]    The Plaintiffs' reliance on Genereaux v. American Beryllia Corp., 577 F.3d 350 (1st Cir. 2009), is unavailing. Not only did that case apply Massachusetts law instead of Georgia law, but there was also a lack of evidence that the plaintiff's employer had knowledge of specific hazards of beryllium. The evidence here establishes that Lockheed had actual knowledge of beryllium's hazards, and the Plaintiffs have failed to provide evidence to the contrary.

beryllium.  Accordingly, we affirm the judgment of the district court.[12]

AFFIRMED.

---

[12]    Because summary judgment for the Defendants is appropriate on the basis of the sophisticated user defense, we need not reach other possible grounds for affirming the judgment of the district court.